1  **THE ROSEN LAW FIRM, P.A.**
2  Laurence M. Rosen, Esq. (CSB# 219683)
3  355 South Grand Avenue, Suite 2450
   Los Angeles, CA 90071
4  Telephone: (213) 785-2610
   Facsimile: (213) 226-4684
5  Email: lrosen@rosenlegal.com
6  Lead Counsel for Plaintiffs and Class

FILED
CLERK, U.S. DISTRICT COURT

NOV 26 2012

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

7              UNITED STATES DISTRICT COURT
8              CENTRAL DISTRICT OF CALIFORNIA
9

| | |
|---|---|
| 10 NEIL VANLEEUWEN AND RODNEY OMANOFF, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, <br><br> Plaintiffs, <br><br> vs. <br><br> KEYUAN PETROCHEMICALS, INC., CHUNFENG TAO, AICHUN LI, WEIFENG XUE, DELIGHT REWARD LIMITED, <br><br> Defendants. | No.: CV-11-09495-PSG (JCGx) <br><br> **SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> CLASS ACTION <br><br> **JURY TRIAL DEMANDED** <br><br> Hon. Philip S. Gutierrez |

22          Lead Plaintiff Neil Vanleeuwen and named plaintiff Rodney Omanoff
23  collectively ("Plaintiffs"), individually and on behalf of all other persons similarly
24  situated, by their undersigned attorneys, for their complaint against Defendants,
25  allege the following based upon personal knowledge as to their own acts, and
26  information and belief as to all other matters, based upon, *inter alia*, the
27  investigation conducted by and through their attorneys, which included, among
28  other things, a review of the defendants' public documents, conference calls and

1

announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Keyuan Petrochemicals, Inc. ("Keyuan" or the "Company"), securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a securities class action on behalf of the following "Class":

(a)      all persons other than Defendants who purchased the common stock of Keyuan between August 16, 2010 and October 7, 2011, inclusive, (the "Class Period"); and seeking to recover damages caused by Defendants' violations of federal securities laws; and

(b)      all persons other than Defendants who purchased Keyuan securities pursuant to the confidential private offering memorandum dated March 22, 2010 ("Offering Documents"), consisting of purchasers in the first tranche that closed on April 22, 2010 and the second tranche that closed on May 18, 2010 (collectively the "Private Placement").

2.      Defendant Keyuan is a petrochemical company with its headquarters and operations in the People's Republic of China ("PRC").

3.      In connection with the sale of Keyuan stock in the Private Placement and throughout the Class Period defendants failed to disclose material related party transactions that personally benefitted Keyuan management.

4.      Keyuan made undisclosed related party sales to, among others, entities owned and controlled by defendant Chunfeng Tao, the Chairman and CEO of the Keyuan.  Related party sales to Tao were over $21 million and $100 million in 2009 and 2010, respectively.  These amounts represented nearly 31% and 20% of Keyuan's sales in 2009 and 2010.  Keyuan also made undisclosed related party purchases of raw materials from Tao in 2009 and 2010, representing 36% and 47% of the value of all of the Company's inventory for those years, respectively.

5.    The undisclosed related party transactions were not arms' length transactions and unjustly enriched the related parties.  Keyuan's gross profit margins from related party sales were much lower than what Keyuan earned from arm's-length external sales.

6.    The Company's own auditor took the drastic step of qualifying its 2010 audit opinion and explaining that "[i]t is possible that the terms of these transactions may not be the same as those that would result from transactions among unrelated parties."

7.    Keyuan also lied to freight companies to benefit the related parties.  In its 2010 10-K Keyuan admitted that "[i]n the past we sometimes accommodated requests from our customers to change the name of products so that our customers could save on freight costs."

8.    Keyuan also admitted in the 2010 10-K that it may have committed crimes in connection with the related party transactions.  Keyuan stated in its 2010 10-K:

> [W]e engaged with certain related and other parties in short term financings to overcome the restrictions regarding the use of certain bank loans or to satisfy the banks' internal requirements to demonstrate the usage of the loans. Though we are current on our loan payments and as a general rule, the risk of prosecution and or civil liabilities is diminished if the loans have been repaid, we are advised that such practices may have been in violation of PRC banking laws.

9.    As a result of Defendants' undisclosed related party transactions which rendered the Company's financial statements and Offering Documents materially misleading, trading in Keyuan's stock was halted on April 1, 2011.

10.    When Keyuan's stock began to trade again on October 7, 2011, it fell over $3.83/share, or 69%-- causing investors' substantial losses.

11.    On September 17, 2012 the Company announced that it received a Wells Notice from the SEC in connection with a with prospective civil injunctive securities fraud action against Keyuan.  Keyuan also announced that defendant Tao

received a Wells Notice alleging that he violated Section 304 of the Sarbanes-Oxley Act of 2002. These investigations concern the undisclosed related party transactions detailed herein.

## JURISDICTION AND VENUE

12. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act, and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

13. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

14. Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).

15. In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

16. Lead Plaintiff Neil Vanleeuwen purchased Keyuan securities at artificially inflated prices during the Class Period and has been damaged thereby. His PSLRA certification has previously been filed with the Court and is incorporated herein by reference.

17. Plaintiff Rodney Omanoff purchased Keyuan securities in Keyuan's Private Placement at artificially inflated prices. His PSLRA has previously been filed with the Court and is incorporated herein by reference.

18. Defendant Keyuan is a Nevada Corporation, headquartered in China. Keyuan through its operating subsidiaries engages in the manufacture and sale of petrochemical products in China. Until October 6, 2011, Keyuan's stock was listed

on the NASDAQ exchange under ticker "KEYP."   On October 6, 2011, the NASDAQ de-listed the Company's stock, it began to trade on over-the-counter on the "Pink Sheets" under ticker KEYP.PK.

19.     Keyuan became a public company through a reverse merger transaction that commenced on April 22, 2010 through a share exchange agreement. The reverse merger was completed on May 12, 2010.

20.     Defendant Chunfeng Tao ("Tao"), was and is, Chairman of the Board and Chief Executive Officer of Keyuan.  Mr. Tao indirectly controls approximately 34.52% of Keyuan's common stock.

21.     Defendant Aichun Li ("Li") was the Chief Financial Officer of the Keyuan until her resignation from the Company on October 12, 2011.  Li is a US Certified Public Accountant.  Li earned an MBA and a MS in Accounting from two U.S. universities.  Li previously served as a member of the CFO Group with Bank of America and consultant with Deloitte Touche LLP.

22.     Defendant Weifang Xue ("Xue") was the Company Vice President of Accounting until August 2011.  In the Company's SEC filings, Xue was noted as a key and essential employee of the Company.  Xue was "terminated" as a result of the Company's misstated SEC filings.

23.     Defendant Delight Reward Limited ("Delight Reward") is a British Virgin Islands Corporation, and at all times during the Class Period, a controlling shareholder of Keyuan.  According to Keyuan's annual report for the fiscal year ended December 31, 2010, Delight Reward beneficially owns more than 80% of Keyuan's common stock.

24.     Tao, Li, Xue, and Delight Reward, are herein referred to collectively as the "Individual Defendants."

25.     Keyuan is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

26.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Keyuan under *respondeat superior* and agency principles.

**The Private Placement**

27.    Keyuan through its placement agent TriPoint Global Equities, LLC offered and sold $30 million of units consisting of 6% series A convertible preferred stock, common stock, and warrants to purchase common stock of Keyuan through the Private Placement memorandum.  Attached to memorandum was the audited financial statements of Keyuan for the fiscal years ended December 31, 2009 and 2008; and a PowerPoint presentation prepared by TriPoint Global Equities, LLC (collectively the "Offering Documents.").  The Offering Documents are attached hereto as Exhibit 1 and is incorporated herein.

28.    The Private Placement was offered pursuant to SEC Regulation D (17 C.F.R. §230.500) which exempted the offering from the registration requirements of Section 5 of the Securities Act of 1933.  Therefore, pursuant to 17 C.F.R. §230.502(b), *et seq.*, Keyuan was required to provide financial statements to investors that complied with GAAP and SEC regulation.

29.    As part of the Private Placement, Tao delivered 5 million shares of Keyuan common stock into escrow. This was used as an inducement to investors in the Private Placement.  If Keyuan did not achieve net income of $33 million in 2010, the escrowed shares would be provided to the investors in the Private Placement based on each percentage point the Company missed the $33 million net income target.

30.    The Offering Documents were uniformly presented to each prospective and actual purchaser of the Private Placement.  While the Offering Documents had sections for related party transactions and the audited financial statements that purported to comply with GAAP and SEC regulations, none of the related party transactions complained of herein was disclosed in the Offering Documents, rendering them materially misleading.

31.   The first tranche of the Private Placement was consummated on April 22, 2010 for the issuance and sale of 661,562 units at a purchase of $35 per unit, consisting of an aggregate of:

- 5,954,058 shares of Series A convertible preferred stock, par value $0.001 per share convertible into the same number of shares of Common Stock;
- 661,562 shares of Common Stock;
- three-year Series A Warrants to purchase up to 661,562 shares of Common Stock at an exercise price of $4.50 per share; and
- three-year Series B Warrants to purchase up to 661,562 shares of Common Stock at an exercise price of $5.25 per share, for aggregate gross proceeds of approximately $23.2 million.

32.   On May 18, 2010, the Company closed the second tranche of the Private Placement for the issuance and sale of 87,142 units at a purchase price of $35 per unit, consisting of an aggregate of:

- 784,278 shares of Series A convertible preferred stock, par value $0.001 per share convertible into the same number of shares of Common Stock;
- 87,142 shares of Common Stock;
- three-year Series A Warrants to purchase up to 87,142 shares of Common Stock at an exercise price of $4.50 per share; and
- three-year Series B Warrants to purchase up to 87,142 shares of Common Stock at an exercise price of $5.25 per share, for aggregate gross proceeds of $3,049,970.

**Tao Prepared the Offering Documents**

33.   At the time of the Private Placement, Tao was Keyuan's Chairman, President, Chief Executive Officer and Chief Financial Officer.  Thus, Tao was the controlling person of Keyuan under Section 20(a) of the Exchange Act. Consequently, Tao's scienter at the time of the Private Placement is imputed the Company.

34.    Plaintiffs engaged the services of an investment banking expert, Mr. William H. Purcell, in determining the duties and responsibilities of an issuer's CEO and CFO and a placement agent in performing a private placement of securities.  Mr. Purcell has over 45 years of experience as an investment banker. He started his career at the special bracket firm of Dillon, Read & Co. Inc. ("Dillon Read") after graduation from business school in 1966. He was elected a Managing Director in 1982. During his approximately 25 years at Dillon Read, he worked in all areas of corporate finance and the capital markets - - including for a number of years being co-head of Dillon Read's private placement department. He is currently a Senior Director of Seale & Associates, an investment banking firm in the Washington, DC area. During his career, Mr. Purcell has worked on over 100 financing transactions - - both debt and equity financings and both public and private financings. He has also worked on over 100 merger and acquisition related transactions. In addition, Mr. Purcell has been an expert witness over the years in over 100 cases, a number of which have involved disclosure and due diligence issues. Mr. Purcell graduated from Princeton University with a B.A. in economics in 1964, and from New York University Graduate School of Business with an MBA in 1966.

35.    Mr. Purcell reviewed the Offering Documents and he has formed the following opinions about the preparation of Keyuan's Offering Documents:

(a)    It is well understood in the investment banking industry and the financial community generally that the responsibility for preparing an offering memorandum or private placement memorandum (or as in the case of Keyuan, the Offering Documents) is primarily that of the senior management of the company, especially the CEO and/or President of the company and the CFO.  In my many years of executing private placement transactions at Dillon Read, I almost exclusively worked with the CEO and/or CFO of the company in preparing the private placement transaction.  In regard to companies with a modest market

capitalization, such as Keyuan, I would have worked with both the CEO and CFO of the company in connection with the private placement.

(b)     In every instance, not only would  the CEO and CFO review and comment on the Offering Documents, I as placement agent would make them both initial every page of the Offering Documents to ensure that they agreed with language, number, and any statistics set forth in the Offering Documents.  This procedure was essential to me as placement agent given their intimate knowledge of the company, in order to fulfill my duty of due diligence as a placement agent to ensure that the Offering Documents are accurate and not misleading in any way.

(c)     The responsibility of preparing a private placement memorandum ("PPM") to be used by a placement agent in a private offering to provide relevant information to potential investors involves not just an accurate and detailed description of the company's business but most importantly an accurate and detailed description of its financial position, operating performance and the significant factors that affect, or will affect, the company's performance in future years.

(d)     Nobody is better able to provide such important and relevant information than the CEO and/or the CFO of a company.  Their job function is precisely to know this information and to plan the company's business strategy.

(e)     A company's auditing firm also has an important responsibility in making sure a company's financial statements are accurate and not misleading in any way.  However, the auditing firm must depend on the fact that the information provided to it by the company's CEO and CFO is accurate and truthful.  Accordingly, an auditing firm receives a written certification or management representation letter from both the CEO and CFO stating that they have reviewed the financial statements and are not aware of any important and/or relevant information not disclosed to the auditors that should be reflected in the financial statements. The representations also generally include any important and/or relevant subsequent events that might have occurred after the date of the financial

9

statements. Any PPM presented to investors must be accurate as of the date it is presented.

(f)    An auditing firm has a duty of due care in preparing a company's financial statements - - but no level of due diligence would most likely uncover outright management lies or fraud. In the case of Keyuan, the auditor would have expected the Company's CEO and/or CFO to accurately disclose <u>all</u> related party transactions, as required by GAAP accounting principles.

(g)    The accurate disclosure of all related party transactions is an absolute must not only for a company's auditor but also for a company's placement agent. The area of related party transactions has historically been a major problem - - because very often related party transactions can be manipulated so that true arm's-length transactions are not reflected and/or possible fraud might be involved. It is my understanding that the magnitude of undisclosed related party transactions in the case of Keyuan was as much as $100 million (in sales) over a two-year period.

(h)    The placement agent for a financing also has a duty of due diligence in assisting with the preparation of a PPM. The placement agent has a duty to make sure to the best of its ability that the disclosures being made to investors are accurate and not misleading and do not omit any important information. The placement agent's due diligence should involve interviewing both company management, especially the CEO and the CFO, and the company's auditor to ensure that the financial information in the Offering Documents are accurate and complete. However, as stated previously, even a thorough due diligence is unlikely to uncover fraud or fraudulent activities. Only the company's CEO and CFO would be aware of the fraud, if any.

(i)    The information provided in Keyuan's Offering Documents was that primarily of the Company's CEO and CFO. With the CFO of the Company having an MBA and MS degrees in accounting and having previously worked for or with Bank of America and Deloitte Touche, it is unconceivable from an investment

banking point of view that the CFO, as well as the CEO, did not know about the misrepresented related party transactions.

(j)     The Offering Documents have language indicating that the PPM information has been provided by Keyuan management, i.e.: "The information contained in this Memorandum is proprietary to the Company…" (at p. 000003) and "The agents [the placement agent] and the agent's counsel assume no responsibility …. for the accuracy, adequacy or completeness… as to whether all information concerning the Company required to be disclosed by the Company has been generally disclosed." (at p. 000096).

(k)     In addition, it is well known and understood that a company's CFO typically has the responsibility to make sure all financial statements presented to investors and/or regulatory authorities if applicable, are accurate and complete.

36.     In connection with the Private Placement, Keyuan had a number of road show events to solicit investors to purchase in the Private Placement.

37.     At these events prospective investors were provided the Offering Documents.  For example, during a road show event at the 21 Club in New York City in the late fall or early Spring 2010, defendant Tao made a presentation to prospective investors by going over the information in Offering Documents.

38.     During road show events, TriPoint CEO Mark Elenowitz told investors that he worked directly with defendant Tao for one to two years performing due diligence on Keyuan and checking the accuracy of the company's financial statements and operations.

**GAAP Required Defendants to Disclose The Related Party Transactions**

39.     GAAP constitutes those standards recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.

40.     GAAP are the common set of accounting principles, standards, and procedures that companies in the United States use to compile their financial statements.

41.    The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board (the "FASB").

42.    SEC and NASDAQ rules and regulations require that publicly traded companies such as Keyuan include financial statements that comply with GAAP in their annual and quarterly reports filed with the SEC.   *See* Section 13 of the Exchange Act; Rule 10-01(d) of Regulation SX.

43.    SEC Rule 4-01(a) of Regulation S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1) (emphasis added).

44.    Management retains responsibility for preparing financial statements that conform with GAAP. The American Institute of Certified Public Accountants ("AICPA") Professional Standards provide:

> The financial statements are management's responsibility . . . Management is responsible for adopting sound accounting policies and for establishing and maintaining internal controls that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management. . . . Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility.

AIPCA, Professional Standards, vol. 1, AU § 110.02 (1998).

45.    GAAP Statement of Financial Accounting Standards ("SFAS") and SEC regulation S-K required the Company to disclose all material related party transactions.

46.    SFAS No. 57 and No. 850 provide that a public company's "[f]inancial statements shall include disclosures of material related party transactions." SFAS No. 57 ¶ 2; 850-10-50-1.

47.     "Related party transactions" include those between "an enterprise and its principal owners, management, or members of their immediate families" and those between a company and its "affiliates." SFAS No. 57 ¶ 1; 850-10-05-3. "Affiliate" includes any company that is under common control or management with the public company. SFAS No. 57 ¶ 24(a, b); 850-10-20.

48.     Disclosures of related party transactions shall include (a) the nature of the relationship involved, (b) a description of the transactions for each period for which income statements are presented and such other information necessary to an understanding of the effects of the transactions on the financial statements, (c) the dollar amount of transactions for each of the periods for which income statements are presented, and (d) amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement. SFAS No. 57 ¶ 2; 850-10-50-1.

49.     Keyuan admitted in a Form 8-K filed with the SEC on October 20, 2011 that GAAP required the Company to disclose related party transactions that it previously failed to disclose during the Class Period.

50.     Keyuan admitted in the Form 8-K filed with the SEC on October 20, 2011 that the failure to disclose the additional related party transactions was a violation of GAAP requiring Keyuan to restate its financial statements.

51.     Restatements are required for material accounting errors that existed at the time financial statements were prepared.  *See* SFAS 154.

52.     An accounting "error" is a term of art and results from, among other things, an error in recognition, measurement, or mistakes in the application of GAAP.  SFAS 154.

53.     Under SFAS 154, errors result from (i) mathematical mistakes, (ii) mistakes in application of GAAP, or (iii) oversight or misuse of facts that existed at the time the financial statements were prepared.

54.     The failure to disclose the related party transactions herein was an oversight or misuse of facts that were actually known to Defendants Tao, Li and Xue at the time they signed and filed Keyuan's financial statements with the SEC.

55.     Chinese Generally Accepted Accounting Principles ("PRC GAAP") is substantially the same as GAAP as they both require disclosure of material related party transactions.

56.     ABSE 36 (the applicable Chinese GAAP) requires disclosure in the financial statements of related party transactions.  The definition of related parties is materially the same as SFAS 57.  A translated copy of ABSE 36 is attached hereto as Exhibit 2 and is referenced herein.

**SEC Regulations Mandate Disclosure of the Related Party Transactions**

57.     SEC Regulation S-K ("Reg. S-K") (together with the General Rules and Regulations under the Securities Act of 1933 ["Securities Act"] and the Exchange Act and the forms under these Acts) states the requirements applicable to the content of the non-financial statement portions of the annual reports on form 10-K, quarterly reports on form 10-Q and proxy statements on from 14A. (See, Reg. S-K, §229.10).

58.     Reg. S-K at Section 229.404, Item 404, required, at all times during the Class Period, that the Company "[d]escribe any transaction, since the beginning of the registrant's last fiscal year, or any currently proposed transaction, in which the registrant was or is to be a participant and the amount involved exceeds $120,000, and in which any related person had or will have a direct or indirect material interest."

59.     Reg. S-K required the disclosure of detailed information concerning related party transactions exceeding $120,000, including the names of the "related person" or entity participating in the transaction, and the amounts of the transaction.

60.     Reg. S-K Section 229.303, Item 404 (b)(1)(6) also mandates disclosure of any other relationships that the registrant is aware of between the nominee or

director and the registrant that are substantially similar in nature and scope to those relationships listed in paragraphs (b)(1) through (5).

61.    A "related person" is defined by Reg. S-K as including any director or executive officer of the Company, any nominee for director, or any immediate family member of a director or executive officer of the registrant, or of any nominee for director or any 5% or greater shareholder.

## CEO TAO AND CFO LI INTENTIONALLY CONCEALED THE RELATED PARTY TRANSACTIONS

62.    As part of each annual audit, under Generally Accepted Auditing Standards AU 333, and 334, the Company's auditor is obligated to inquire, either orally or in writing, of each senior officer and each director as to the existence of any related party transactions with the Company.

63.    As part of each annual audit, under Generally Accepted Auditing Standard AU 560, the Company's auditor is obligated to inquire of management whether the corporation has entered into any material transactions that must be listed as subsequent events in the financial statements pursuant to GAAP and SEC regulations.

64.    In addition, prior to issuing an unqualified or "clean" audit opinion, an auditor will require that a Company's Chief Executive Officer and its Chief Financial officer sign a "management representation letter."    These written representations are mandated as a professional standards requirement under the Statements on Auditing Standards No. 85 ("SAS 85").

65.    Under SAS No. 85, a public company's independent auditors are required to obtain written representations from a company's senior management, normally the chief executive, as part of the audit process. (See also AU 333.06). These representations are contained in what is known in auditing jargon as a "management representation letter."    The management representation letter should cover all periods covered by the auditor's report.    Management representation letters are used to provide information to the auditors about matters that cannot be

objectively tested because they depend on management's knowledge, such as management's intentions and the completeness of information provided to the auditor.   A copy of a standard management representation letter is attached as Exhibit 3 hereto and incorporated herein by reference.

66.    The management representation letter inquires of management whether there are any related party transactions or material subsequent events that must be disclosed in the financial statements.

67.    The management representation letter required defendants Chunfeng Tao and Aichun Li to individually represent to the Company's independent auditors each reporting period that as of that date, among other things:

i.    He or she has disclosed all related party transactions relevant to the Company to the auditors and that he was not aware of any other such matters required to be disclosed in the financial statements.

ii.    All the accounting records have been made available to the auditor for the purpose of its audit.

iii.    All the related party transactions undertaken have been properly reflected and recorded in the accounting records.

iv.    All minutes of directors meetings and summaries of board actions for which minutes are not yet available have been made available to the auditor.

v.    There are no material transactions that have not been properly recorded in the accounting records underlying the financial statements.

vi.    All guarantees under which the company is contingently liable have been properly recorded or disclosed in the financial statements

vii.    The financial statements are fairly presented in conformance with Generally Accepted Accounting Principles.

viii.    The Company has no plans or intentions that may materially affect the carrying value or classification of assets and liabilities.

68.     The last paragraph of the management representation letter required The CEO and the CFO to state: "To the best of our knowledge and belief, no events have occurred subsequent to the balance-sheet date of this letter that would require adjustment to or disclosure in the aforementioned financial statements."

69.     The management representation letter thus required CEO Tao and CFO Li to disclose to the auditors the details of the related party transactions.

70.     Tao and Li signed knowingly false management representation letters to Keyuan's auditors prior to issuance of the financial statements in the 2009 and 2010 Form 10-K annual reports filed during the Class Period, otherwise the auditors would have learned of and disclosed the related party, as eventually occurred once the transactions were discovered and disclosed on October 20, 2011.

71.     Additionally, for each quarterly financial report Statement on Standards for Accounting and Review Services No. 9 ("SSARS") required the Keyuan's auditors obtain from Tao and Li Management Representation letters in connection with the Company's second and third quarter 10-Qs filed with the SEC during the Class Period.

72.     These review Management Representation letters required Tao and Li to certify that they disclose all related party transactions to its auditor.  A sample Management Representation for a review is attached hereto as Exhibit 4 and is incorporated herein.  The letter was published by in the April 2004 edition of the *CPA Journal,* which is published by the New York State Society of CPAs.

73.     Tao and Li signed knowingly false management representation letters to Keyuan's auditors prior to issuance of the financial statements in the Company's second and third quarter 10-Qs, otherwise the auditors would have learned of and disclosed the related party, as eventually occurred once the transactions were discovered and disclosed on October 20, 2011.

**The Undisclosed Related Party Transactions**

74.    In Keyuan's financial statements filed with the SEC during the Class Period and in the Offering Materials, Keyuan failed to disclose the following related party transactions.

75.    According to Keyuan's 2010 10-K filed with the SEC on October 20, 2011, Keyuan admitted that it failed to disclose and should have disclosed the following related party sales of products in its periodic reports filed with SEC:

| Sales to Related Parties | | |
|---|---|---|
| Related Party | Year ended December 31, | |
| | 2009 | 2010 |
| Ningbo Kewei Investment Co., Ltd. ("Ningbo Kewei")[1] | $4,869,959 | -- |
| Ningbo Kunde Petrochemical Co, Ltd. ("Ningbo Kunde")[2] | $14,121,663 | $101,680,459 |
| Ningbo Wanze Chemical Co., Ltd ("Ningbo Wanze")[3] | $2,500,021 | -- |
| Ningbo Zhenhai Jinchi Petroleum Chemical Controlled by Mr. Shou Co., Ltd ("Zhenhai Jinchi")[4] | -- | $10,180,273 |
| Total Related Party Sales | $21,491,643 | $111,860,732 |

76.    The related party sales were a material percentage of the Company's total sales.

| | Year ended December 31, | |
|---|---|---|
| | 2009 | 2010 |
| Total Related Party Sales: | $21,491,643 | $111,860,732 |
| Total Sales | $68,653,603 | $558,752,069 |
| Percentage of Total Sales to Related Parties | 31% | 20% |

77.    Keyuan also admitted in its 2010 10-K that it failed to disclose and should have disclosed the related nature of certain other sales:

| | Year ended December 31, | |
|---|---|---|
| | 2009 | 2010 |
| Ningbo Litong Petrochemical Co., Ltd ("Ningbo Litong")[5] | $17,922,288 | $29,625,766 |

---

[1] According to the 2010 10-K, defendant Tao controls Ningo Kewei.
[2] According to the 2010 10-K, defendant Tao's mother was a 65% nominee shareholder of Ningbo Kunde.
[3] According to the 2010 10-K, defendant Tao's sister-in-law is Ningbo Wanze's legal representative.
[4] According to the 2010 10-K, Hengfeng Shou, the Vice President of Ningbo Keyuan Petrochemical, controls Zhenhai Jinchi.
[5] According to the 2010 10-K, Ningbo Liton is the former 12.75% nominee

78.    Keyuan admitted in its 2010 10-K that it failed to disclose and should have disclosed the following purchases of raw materials from related parties:

| Purchase of Raw Material Purchases From Related Parties | | |
|---|---|---|
| | Year ended December 31, | |
| | 2009 | 2010 |
| Ningbo Kewei | $952,594 | $4,465,563 |
| Ningbo Kunde | $3,777,986 | $20,549,245 |
| **Total** | $4,730,580 | $25,014,808 |

79.    The purchases of raw material from related parties was a material amount of the Company's raw material inventory:

| | Year ended December 31, | |
|---|---|---|
| | 2009 | 2010 |
| **Total Raw Material Purchases From Related Parties** | $4,730,580 | $25,014,808 |
| **Total Raw Materials** | $12,922,654 | $53,160,604 |
| **Percentage of Raw Materials from Related Parties** | 36% | 47% |

80.    Keyuan also admitted in its 2010 10-K that it failed to disclose and should have disclosed additional purchases of raw material due to its related nature:

| | Year ended December 31, | |
|---|---|---|
| | 2009 | 2010 |
| Ningbo Litong | $3,280,566 | $18,994,104 |

81.    Keyuan admitted in its 2010 10-K that it failed to disclose and should have disclosed additional related party transactions involving among, other things, accounts receivable to the Company from related parties, and financing transactions between related parties.

82.    Keyuan through its quarterly and restated quarterly reports it filed with the SEC on November 1, 2011, admitted that it should have disclosed the above related party transactions in its interim 2010 and 2009 quarterly periods, when those financial statements were first issued.

83.    In Keyuan's restated 10-Q for the second quarter ended June 30, 2010 filed with the SEC on November 1, 2011, the Company admitted that it failed to disclose and should have disclosed the following related party sales and purchases of raw material from related parties:

shareholder of Ningbo Keyuan.

| Sales to Related Parties | | | | |
|---|---|---|---|---|
| | Three Months ended June 30, | | Six Months ended June 30 | |
| | 2009 | 2010 | 2009 | 2010 |
| Ningbo Kunde | -- | $22,424,477 | -- | $43,228,614 |
| Zhenhai Jinchi | -- | $3,941,976 | -- | $3,958,248 |

| Purchases of Raw Materials from Related Parties | | | | |
|---|---|---|---|---|
| | Three Months ended June 30, | | Six Months ended June 30 | |
| | 2009 | 2010 | 2009 | 2010 |
| Ningbo Kewei | -- | -- | -- | $4,427,831 |
| Ningbo Kunde | -- | -- | -- | $1,308,488 |

84.    In Keyuan's restated Form 10-Q for the third quarter ended September 30, 2010 filed with the SEC on November 1, 2011, the Company admitted that it failed to disclose and should have disclosed the following related party sales and purchases of raw material from related parties:

| Sales to Related Parties | | | | |
|---|---|---|---|---|
| | Three Months ended September 30, | | Nine Months ended September 30 | |
| | 2009 | 2010 | 2009 | 2010 |
| Ningbo Kunde | $7,362,101 | $35,723,405 | $7,362,101 | $79,072,843 |
| Zhenhai Jinchi | -- | $2,940,964 | -- | $6,910,274 |

| Purchases of Raw Materials from Related Parties | | | | |
|---|---|---|---|---|
| | Three Months ended September 30, | | Nine Months ended September 30 | |
| | 2009 | 2010 | 2009 | 2010 |
| Ningbo Kewei | -- | -- | -- | $4,440,207 |
| Ningbo Kunde | $2,530,203 | $14,154,723 | $2,530,203 | $15,409,928 |

## The Undisclosed Related Party Transactions Were Not Arm's Length Transactions

85.    The undisclosed related party transactions personally benefited the identified defendants and were not arm's length transactions.

86.    The gross profit margin on related party sales was significantly smaller than the profit margins Keyuan realized from non-related party sales.    Stated differently, dollar-for-dollar Keyuan was earning less profit from sales related parties than it was on sales to non-related parties.

87.    For example, for Q3 2010 the gross profit margin on the related party sales was 11.4%, yet it was 25.2%% for the external sales.   A table comparing the gross profit margins from related party sales and external sales for each reporting period in 2010 is attached Exhibit 5, and is incorporated herein by reference.

88.    Not surprisingly, in the Company's 2010 10-K filed with the SEC on October 20, 2010 that set forth the  restatement adjustments above, the Company's auditor took the drastic step of qualifying its audit opinion by explaining that:

> The Company has significant transactions and relationships with related parties and certain other parties which are described in Note 24 to the consolidated financial statements. It is possible that the terms of these transactions may not be the same as those that would result from transactions among unrelated parties.

89.    The Company admitted that it committed crimes in connection with the related party transactions.   In the 2010 10-K Keyuan revealed that:

> [W]e engaged in certain related and other parties in short term financings to overcome the restrictions regarding the use of certain bank loans or to satisfy the banks' internal requirements to demonstrate the usage of the loans. Though we are current on our loan payments and as a general rule, the risk of prosecution and or civil liabilities is diminished if the loans have been repaid, we are advised that such practices may have been in violation of PRC banking laws.

90.    Defendants also lied to benefit the related parties.   In the 2010 10-K, the Company stated in relevant part:

> In the past we sometimes accommodated requests from our customers to change the name of products so that our customers could save on freight costs.

Attached as Exhibit 6 and incorporated by reference herein are selected portions of Keyuan's October 20, 2011 10-K in which it details the related party transactions and the nature of the relationships that require such transactions be disclosed as "related party" under GAAP.

**Defendants' Misleading Financial Statements**

91.    During the Class Period, the following SEC filings were rendered materially misleading due to Defendants' nondisclosure of the material related party transactions.

(a)    10-Q for the second quarter ended June 30, 2010, filed with the SEC on August 16, 2010, signed by defendants Tao and Li; and

(b)    10-Q for the third quarter ended September 30, 2010, filed with the SEC on November 15, 2010, signed by defendants Tao, Li, and Xue.

(c)    Registration Statements on form S-1 filed with the SEC on September 2, 2010, October 15, 2010,  November 3, 2010,  December 29, 2010, January 14, 2011 , each signed by Chunfeng Tao, Aichun Li, and Weifeng Xue.

92.    Defendants' nondisclosure of the related party transactions in the financial statements for fiscal 2009 included in the Offering Documents rendered those documents materially misleading.  The Company's Offering Documents, had section entitled "Certain Relationships and Related Party Transactions."  While certain related party transactions were disclosed, none of the above related party transactions were disclosed.

93.     The Offering Documents for the Private Placement also contained audited financial statements of Keyuan for the fiscal years ended December 31, 2009 and 2008.  There was no disclosure of any related party transactions in the Offering Documents.

94.    Defendants represented that Keyuan's financial statements included in each of the above SEC filings were prepared according to, and conformed to, GAAP.

95.    Each of Keyuan's 10-Qs, S-1 Registration Statements and the Offering Documents omitted to disclose the related party transactions, violated GAAP and were therefore misleading.

**Truth Begins to Emerge and Materialize Damaging Investors**

96.     Prior to market open on April 1, 2011, trading in the Company's stock was inexplicably halted.  The last trade was at $4.88/share.

97.     Later in the morning, the Company filed a Form 12b-25 with the SEC announcing that it would not be able to timely file its annual report for the fiscal year ended December 31, 2010 due to issues raised by Keyuan's auditor, KPMG, LLP, relating to "regarding certain cash transactions and recorded sales."  The announcement also revealed that the Audit Committee has also commenced an investigation.  The Form 12b-25 states:

> In connection with the Registrant's financial statements as at December 31, 2010 and for the fiscal year then ended, issues were raised by the Registrant's independent auditor, primarily relating to unexplained issues regarding certain cash transactions and recorded sales. The independent auditor reported these issues to the Registrant's Audit Committee. The Registrant's Audit Committee has engaged independent legal counsel and commenced an investigation of the issues raised by the Registrant's auditors. Inasmuch as completion of Registrant's 2010 financial statements is dependent, following completion of the Audit Committee's investigation, upon a satisfactory resolution of the issues raised and any other matters that may come to light as a result of further audit procedures, the Registrant was not able to complete its Form 10-K Annual Report by March 31, 2011. Although the Registrant believes that the Audit Committee shall undertake to complete its investigation as soon as practicable, and the Registrant shall use its best efforts to file the Annual Report by April 15, 2011, there can be no assurance that it will be able to do so by such date.

98.     During the afternoon on April 1, 2011, the Company filed an 8-K with the SEC reiterating the matters set forth in the SEC filings earlier that day, and announcing that the Company has been informed by its auditor that the Company's previously issued financial statements cannot be relied upon.  The 8-K states in relevant part:

> Item 4.02 Non-Reliance on Previously Issued Financial Statements
>
> We are in the process of preparing our Annual Report on Form 10-K for the year ending December 31, 2010, which is due on March 31, 2011.  In

connection with our consolidated financial statements as at December 31, 2010 and for the fiscal year then ended, issues were raised by our independent auditor, primarily relating to the unexplained issues regarding certain cash transactions and recorded sales. The independent auditor reported these issues to our Audit Committee, and our Audit Committee has commenced an investigation of the issues raised. Inasmuch as completion of our 2010 consolidated financial statements is dependent, upon a satisfactory resolution, following completion of our Audit Committee's investigation, of the issues raised and any other matters that may come to light as a result of further audit procedures, we were not able to complete our Form 10-K Annual Report by March 31, 2011. Although we believe that the Audit Committee has undertaken to complete its investigation as soon as practicable, and we will use our best efforts to file the Form 10-K Annual Report by April 15, 2011, there can be no assurance that we will be able to do so by such date.

In light of the investigation by our Audit Committee, our auditors have informed us that there is a possibility that we may be required to make certain adjustments to certain of our previously issued financial statements, and that such previously issued financial statements may not be relied upon. Although we are hopeful that the results of our Audit Committee's investigation will not require material adjustments or restatements of our historical financial statements, there can be no assurance that this will be the case.

As set forth above, our Audit Committee is conducting an investigation of the above referenced issues raised by our independent auditors during their audit of the financial statements that are to be included in the subject Annual Report. The investigation has just commenced and no conclusions have been reached by the Audit Committee. As it is possible that the issues raised may either result in material changes or restatements of our financial statements previously filed, or be resolved to the satisfaction of both the Audit Committee and the auditors, at this time, we cannot estimate the type of or amount of change that may occur in connection with the audit of our 2010 consolidated financial statements or any financial statements previously filed.

99.    On May 20, 2011, KPMG resigned as the Company's auditor.

100.    On October 6, 2011, the Company filed an 8-K that the Company's stock would be delisted from the NASDAQ.

101.   On October 7, 2011, after having been halted since April 1, 2011, the Company's stock began trading over-the-counter on the "Pink Sheets."   The Company's stock opened for trading at $1.05/share (down $3.83/share) and eventually closed at $1.50/share, a decline of $3.38/share or 69%.

102.   On October 19, 2011, the Company filed an 8-K with the SEC that Keyuan's Q2 and Q3 2009 10-Qs would be restated, because of, among other things, the need to add "disclosures of our related party transactions to ensure that we include all of the disclosures required under US GAAP and the rules and regulations of the Securities Exchange Commission."

103.   On October 20, 2011 the Company filed its annual report for the fiscal year ended December 31, 2010 which provided certain restatement adjustments relating to the undisclosed related party transactions set forth above.

104.   On November 1, 2011, the Company filed its restated 10-Q of the second quarter ended June 30, 2010, and third quarter ended September 30, 2010.

**Additional Allegations Demonstrating Scienter**

105.   The breadth and scope of the related party transactions support a strong inference of scienter.   In addition to the millions in sales and purchases of raw materials, there were undisclosed related party transactions, there was related party purchase of transportation services, related party guarantees, short-term financings to and from related parties, and accounts payable and receivable to related parties.   There were  more than 16 different related party entities involved in the undisclosed related party transactions.

106.   Keyuan was aware of the requirement to disclose material related party transactions, as it disclosed some related party transactions in the Offering Documents and in periodic reports filed with the SEC during the Class Period.

107.   The Company's extensive and pervasive lack of internal controls as set forth by the 2010 10-K and the restated 10-Qs filed with the SEC.

108.   During the Class Period, as evidenced by the 2010 10-K, the Company had "[a] Chief Financial Officer (CFO) for Chinese operations that did not report to the Company's CFO."

109.   Keyuan's own internal investigation of the matters alleged herein identified possible violations of U.S. Securities laws.

**The SEC Has Warned of Chinese Reverse Merger Companies ("RCMs") Like Keyuan**

110.   Chinese reverse mergers have been a magnet for disreputable stock promoters, leading the SEC to issue warnings about investing in companies like Keyuan.

111.   Shielded by the geographic distance of thousands of miles and operating under a regulatory framework that is a world apart from the SEC's oversight, RCMs have few incentives to provide complete and accurate disclosures to American investors. An August 28, 2010 article in Barron's by Bill Alpert and Leslie P. Norton entitled, "Beware This Chinese Export," discusses the enforcement problems that American regulators face when dealing with Chinese companies that trade on U.S. exchanges through RCMs. The article states that "[t]he SEC's enforcement staff can't subpoena evidence of any fraudulent activities in China, and Chinese regulators have little incentive to monitor shares sold only in the U.S."

112.   U.S. regulators have finally begun to take notice of the manipulation and fraud endemic in RCMs. The SEC has recently established a task force to investigate investors' claims regarding the impropriety and fraud of RCMs trading on the U.S. markets.  SEC Commissioner Luis A. Aguilar (the "Commissioner") discussed Chinese reverse mergers and the process of "backdoor registration," stating:

> In the world of backdoor registrations to gain entry into the U.S. public market, the use by Chinese companies has raised some unique issues, even compared to mergers by U.S. companies. Two important ones are:

•      First, there appear to be systematic concerns with the quality of the
auditing and financial reporting; and

•      Second, even though these companies are registered here in the U.S.,
there are limitations on the ability to enforce the securities laws, and for
investors to recover their losses when disclosures are found to be untrue, or
even fraudulent.

I am worried by the systematic concerns surrounding the quality of the
financial reporting by these companies. In particular, according to a recent
report by the staff of the Public Company Accounting Oversight Board
(PCAOB), U.S. auditing firms may be issuing audit opinions on the
financials, but not engaging in any of their own work. Instead, the U.S. firm
may be issuing an opinion based almost entirely on work performed by
Chinese audit firms. If this is true, it could appear that the U.S. audit firms
are simply selling their name and PCAOB-registered status because they are
not engaging in independent activity to confirm that the work they are relying
on is of high quality. This is significant for a lot of reasons, including that the
PCAOB has been prevented from inspecting audit firms in China.

113.  On June 9, 2011, the SEC issued an Investor Bulletin warning
investors about investing in companies that enter U.S. markets through RCM "…
there have been instances of fraud and other abuses involving reverse merger
companies."  "Given the potential risks, investors should be especially careful when
considering investing in the stock of reverse merger companies," said Lori J.
Schock, Director of the SEC's Office of Investor Education and Advocacy.

## **PLAINTIFFS' CLASS ACTION ALLEGATIONS**

114.  Plaintiffs bring this action as a class action pursuant to Federal Rules
of Civil Procedure 23(a) and (b)(3) on behalf of the following Class: (a) a class
consisting of all persons other than Defendants who purchased the common stock
of Keyuan during the Class Period; and (b) a class consisting of all persons other
than Defendants who purchased Keyuan securities pursuant to  the Private
Placement.  Excluded from the Class are the Defendants, TriPoint Global Equities,
LLC ("TriPoint"), the officers and directors of the Company or TriPoint at all
relevant times, members of their immediate families and their legal representatives,

heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

115.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Keyuan's securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds of members in the proposed Class. Members of the Class may be identified from records maintained by Keyuan or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

116.   Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

117.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and have  retained counsel competent and experienced in class and securities litigation.

118.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether the Offering Documents were materially misleading;

(c)    whether public statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Keyuan; and

(d)    to what extent the members of the Class have sustained damages and the proper measure of damages.

119.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is

impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**Applicability of Presumption of Reliance:**

***Affiliated Ute***

120.  Neither Plaintiffs nor the Class need prove reliance – either individually or as a class because under the circumstances of this case, which involves a failure to disclose the material related party transactions described herein above, positive proof of reliance is not a prerequisite to recovery, pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

**Applicability of Presumption of Reliance:**

**Fraud-on-the-Market Doctrine**

121.  At all relevant times, the market for Keyuan's common stock was an efficient market for the following reasons, among others:

(a)    Keyuan's met the requirements for listing on the NASDAQ, a highly efficient and automated market;

(b)    During the Class Period, on average, over 175,000 shares were traded weekly  or more than 2.0% of the float was traded on a weekly basis, demonstrating a very active and broad market for Keyuan stock and permitting a *strong* presumption of an efficient market;

(c)    As a regulated issuer, Keyuan filed periodic public reports with the SEC;

(d)    Keyuan regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of

press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e)    Keyuan was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace;

(f)    Numerous NASD member firms were active market-makers in Keyuan stock at all times during the Class Period; and

(g)    Unexpected material news about Keyuan was rapidly reflected and incorporated into the Company's stock price during the Class Period.

122.    As a result of the foregoing, the market for Keyuan's common stock promptly digested current information regarding Keyuan from all publicly available sources and reflected such information in Keyuan's stock price.    Under these circumstances, all purchasers of Keyuan's common stock during the Class Period suffered similar injury through their purchase of Keyuan's common stock at artificially inflated prices, and a presumption of reliance applies.

**FIRST CLAIM**

**Violation of Section 10(b) Of**

**The Exchange Act Against and Rule 10b-5**

**Promulgated Thereunder Against All Defendants**

123.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

124.    This claim is brought against Keyuan and all of the Individual Defendants.

125.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1)

deceive the investing public, including plaintiffs and other Class members, as
alleged herein; and (2) cause plaintiffs and other members of the Class to purchase
Keyuan's common stock at artificially inflated prices.   In furtherance of this
unlawful scheme, plan and course of conduct, Defendants, and each of them, took
the actions set forth herein.

126.   Defendants (a) employed devices, schemes, and artifices to defraud;
(b) made untrue statements of material fact and/or omitted to state material facts
necessary to make the statements not misleading; and (c) engaged in acts, practices,
and a course of business that operated as a fraud and deceit upon the purchasers of
the Company's common stock in an effort to maintain artificially high market
prices for Keyuan's common stock in violation of Section 10(b) of the Exchange
Act and Rule 10b-5 thereunder.   All Defendants are sued either as primary
participants in the wrongful and illegal conduct charged herein or as controlling
persons as alleged below.

127.   Defendants, individually and in concert, directly and indirectly, by the
use, means or instrumentalities of interstate commerce and/or of the mails, engaged
and participated in a continuous course of conduct to conceal adverse material
information about the business, operations and future prospects of Keyuan as
specified herein.

128.   These Defendants employed devices, schemes and artifices to defraud,
while in possession of material adverse non-public information and engaged in acts,
practices, and a course of conduct as alleged herein in an effort to assure investors
of Keyuan's value and performance and continued substantial growth, which
included the making of, or participation in the making of, untrue statements of
material facts and omitting to state material facts necessary in order to make the
statements made about Keyuan and its business operations and future prospects in
the light of the circumstances under which they were made, not misleading, as set
forth more particularly herein, and engaged in transactions, practices and a course

of business that operated as a fraud and deceit upon the purchasers of Keyuan's common stock during the Class Period.

129.  Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (1) the Individual Defendants were high-level executives, directors, and/or agents at the Company during the Class Period and members of the Company's management team or had control thereof; (2) each of these defendants, by virtue of his or her responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial condition; (3) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (4) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially misleading.

130.  Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Keyuan's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by Defendants' misleading financial statements issued throughout the Class Period, Defendants, if they did not have actual knowledge of the omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those financial statements were misleading.

131.  As a result of the dissemination of the materially misleading information and failure to disclose material facts, as set forth above, the market price of Keyuan's common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of Keyuan's publicly-traded common stock were artificially inflated, and relying directly or indirectly on the misleading financial statements issued by Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Keyuan common stock during the Class Period at artificially high prices and were or will be damaged thereby.

132.  At the time of said omissions, Plaintiffs and other members of the Class were ignorant of their misleading nature, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding Keyuan's financial results, which were not disclosed by defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Keyuan common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices that they paid.

133.  By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

134.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

135.  This action was filed within two years of discovery of the fraud and within five years of each plaintiff's purchases of securities giving rise to the cause of action.

## SECOND CLAIM

**Violation of Section 20(a) Of**

**The Exchange Act Against the Individual Defendants**

136.  Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

137.  The Individual Defendants acted as controlling persons of Keyuan within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, agency, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the misleading financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that plaintiffs contend are misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

138.  At the time of the Private Placement Tao was Keyuan's Chairman, President, Chief Executive Officer and Chief Financial Officer.  Thus, he had day-to-day control of Keyuan's business and operations.  Given that Tao held nearly all the top executive level positions at the time of the Private Placement, and was also Chairman of Keyuan, Tao had control over the Private Placement, including the drafting of and ultimate authority over the Offering Documents.

139.  Given Tao's control, over the Company and the Private Placement, his scienter is imputed to Keyuan.

140.  In particular, each Defendant had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have

had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

141. As set forth above, Keyuan and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

142. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

143. This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchase of securities giving rise to the cause of action.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

(a) Determining that this action is a proper class action, designating Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Class Counsel;

(b) Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Awarding such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Dated:      November 26, 2012              Respectfully submitted,

                                           **THE ROSEN LAW FIRM, P.A.**

                                           _____
                                           Laurence M. Rosen, Esq. (SBN 219683)
                                           355South Grand Avenue, Suite 2450
                                           Los Angeles, CA 90071
                                           Telephone: (213) 785-2610
                                           Facsimile: (213) 226-4684
                                           Email: lrosen@rosenlegal.com

                                           Lead Counsel for Lead Plaintiff and Class

Second Amended Class Action Complaint for Violation of the Federal Securities Laws-CV-11-09495-PSG (JCGx)`

## CERTIFICATE OF SERVICE

I, Zachary Halper, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury as follows:

I am an employee of the Rosen Law Firm, P.A. I am over the age of eighteen. On November 26, 2012, I served the following **SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES LAWS** by U.S. mail to counsel of record for defendants at the addresses listed below:

PERRIE M. WEINER (Bar No. 134146)
perrie.weiner@dlapiper.com
ROBERT D. WEBER (Bar No. 165992)
robert.weber@dlapiper.com
DLA PIPER LLP (US)
2000 Avenue of the Stars
Suite 400 North Tower
Los Angeles, CA 90067-6023

Counsel for defendant Keyuan Petrochemicals, Inc.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on November 26, 2012, in New York, New York.

Zachary Halper